Rel: December 15, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

_____

## SC-2022-0881
_____

## Ex parte BTC Wholesale Distributors, Inc.; Arhaan, LLC; Birmingham Wholesale, LLC; City Wholesale, Inc.; and The H.T. Hackney Co.

## PETITION FOR WRIT OF MANDAMUS

### (In re: Buffalo Rock Company, Inc.

### v.

### PepsiCo, Inc., et al.)

### (Jefferson Circuit Court: CV-19-900217)

COOK, Justice.

For many years, Buffalo Rock Company, Inc., has contracted with PepsiCo, Inc., for the exclusive bottling and distribution rights for PepsiCo's soft-drink products in certain territories, including Alabama. Despite Buffalo Rock's contracts with PepsiCo, there are a number of wholesalers that purchase PepsiCo's soft-drink products in other states and then sell them to stores in Alabama. Among those wholesalers are the petitioners, BTC Wholesale Distributors, Inc.; Birmingham Wholesale, LLC; Arhaan, LLC; City Wholesale, Inc.; and The H.T. Hackney Co. ("the defendants").

Frustrated with this activity, Buffalo Rock commenced the present action against the defendants, among others, in the Jefferson Circuit Court, alleging claims of tortious interference with a business relationship, tortious interference with a contract, and conspiracy. It sought damages for lost profits and punitive damages, as well as an injunction prohibiting the defendants from continuing to sell PepsiCo's products in its exclusive territories.

Before trial, Buffalo Rock filed three motions in limine. Two of those motions sought to prohibit any evidence, testimony, or arguments in support of what the defendants contend are their central defenses in this

case -- (1) the justification and competitor's privilege defenses and (2) the "antitrust" or illegality defense. The third motion sought to bar evidence, testimony, or arguments related to a PepsiCo program that provides credits to bottlers, like Buffalo Rock, when they identify instances when some other entity is selling PepsiCo's soft-drink products in their exclusive territories. The trial court granted each of those motions.

The defendants jointly petitioned this Court for a writ of mandamus directing the trial court to vacate its orders granting the three motions in limine. For the reasons stated below, we grant the petition in part, deny the petition in part, and issue the writ.

Facts and Procedural History

In 1951, Buffalo Rock entered into an exclusive bottling agreement ("EBA") with PepsiCo in which PepsiCo gave Buffalo Rock the exclusive rights to manufacture, distribute, and sell its soft-drink products within certain designated territories, principally, in Alabama. As one of PepsiCo's exclusive bottlers and distributers, Buffalo Rock would sell in its exclusive territories PepsiCo's soft-drink products to retailers, who would then, in turn, sell those products directly to the consuming public. In exchange for those exclusive bottling and distribution rights, Buffalo

Rock agreed that it would bottle and sell only PepsiCo soft-drink products in its designated territories.[1] Since 1951, Buffalo Rock has routinely renewed its EBAs with PepsiCo.

The defendants sell a variety of products to convenience stores and other small stores ("C-stores") in and around Alabama.[2] Among those products are soft-drink products, including PepsiCo's soft-drinks products. The materials before us indicate that the defendants purchase their soft-drink products from multiple sources, including larger wholesalers located outside Alabama, but they do not purchase those

---

[1]According to the defendants "almost all [of the alleged] transshipped Pepsi drink products in this action originate with former defendant Bottling Group, LLC (also known as Pepsi Beverages Company or PBC)." The materials before us indicate that PBC bottles 80% of PepsiCo's soft-drink products in the United States. In addition to PBC, PepsiCo also has other regional bottlers with which it has EBAs which are allegedly similar to its EBA with Buffalo Rock. PBC and the other bottlers sell PepsiCo soft-drink products to many wholesalers and retailers in other parts of the United States, including the states surrounding Alabama.

[2]Although the defendants' primary customers are convenience stores, they also sell to pharmacies, discount stores, and small grocery stores.

products directly from either PepsiCo or Buffalo Rock.[3] Buffalo Rock contends that, after the defendants buy their soft-drink products from larger out-of-state wholesalers, they then ship them into Buffalo Rock's exclusive territories and sell them to C-stores in those territories. This practice is referred to by the parties as "transshipping."[4]

In its most recent amended complaint, Buffalo Rock contended that third-party transshippers, like the defendants, are "free-riders" who "reap the benefits of hundreds of millions of dollars invested by the independent bottlers[ -- like Buffalo Rock --] to increase local demand for PepsiCo brands." Buffalo Rock further contended that transshippers "do

---

[3]It is undisputed that there is neither a contractual nor a business relationship between PepsiCo and the defendants. It is also undisputed that there is neither a contractual nor a business relationship between Buffalo Rock and the defendants. The defendants are also not a party to Buffalo Rock's EBA with PepsiCo.

[4]The defendants define "transshipping" as the "shipment of a soft drink from one bottler's assigned territory to another bottler's assigned territory for resale." Buffalo Rock, however, defines that term more broadly and asserts that anyone who purchases PepsiCo soft-drink products from a source other than from Buffalo Rock and then resells those products in its exclusive territories is engaging in transshipping, even if those PepsiCo soft-drink products were first purchased from a retailer who initially purchased its PepsiCo soft-drink products from Buffalo Rock inside its exclusive territories.

not pay for the merchandising, inventory rotation, and sales management operations necessary to ensure the sale of PepsiCo [soft-drink products] that meet the standards and specifications that PepsiCo contractually requires of its independent bottler[s]" and that transshippers "frequently sell expired and outdated PepsiCo [soft-drink products] to the public, which causes loss of reputation and market share to the independent bottlers and PepsiCo." Buffalo Rock contends that preventing this type of activity is the whole reason for its exclusive EBAs with PepsiCo and is the only way to make its investments in bottling, distributing, and marketing PepsiCo's soft-drink products under those agreements worthwhile.

Buffalo Rock's EBA states that Buffalo Rock may "bottle and distribute" PepsiCo's soft-drink products in Buffalo Rock's exclusive territories and "nowhere else." However, the EBA does not expressly require Buffalo Rock or PepsiCo to do anything to prevent third parties, like the defendants, from engaging in transshipping. After Congress passed the Soft Drink Interbrand Competition Act of 1980 ("the Soft

Drink Act"), 15 U.S.C. § 3501 et seq., in July 1980,[5] PepsiCo announced its commitment to making sure that none of its exclusive bottlers engaged in transshipping activity and that any such activity occurring in its bottlers' exclusive territories would be reported and put to an end.

To assist its exclusive bottlers, like Buffalo Rock, who might otherwise be impacted by transshipping, PepsiCo established a program called the "Transshipment Enforcement Program" ("the TEP") in 1984. PepsiCo announced that, under the TEP, it would fine bottlers whose products are identified as being for sale in the wrong territory and that it would also provide credits to its bottlers when transshipping practices were identified in their exclusive territories. For years, PepsiCo has operated the TEP. In some instances, PepsiCo has even filed suit against bottlers who had transshipped products into one of its bottler's exclusive territories.

According to Buffalo Rock, over time, the TEP, as designed and enforced, proved not to be sufficiently effective to combat transshipping

---

[5]According to Buffalo Rock, the Soft Drink Act specifically exempted from the United States' antitrust laws the inclusion and enforcement of territorial restrictions in bottling and distribution agreements and was enacted to assist in combatting both bottlers or distributors and third parties who engaged in transshipping.

practices. It claims that the program is costly and time-consuming, especially because Buffalo Rock must identify and report specific incidents of transshipping that must then be investigated by PepsiCo, with the possibility that Buffalo Rock might bear some costs if the report proves inaccurate. According to Buffalo Rock, despite the TEP program, a significant amount of transshipping activity goes unchecked and has resulted in its loss of millions of dollars' worth of sales.

In 2010, Buffalo Rock and PepsiCo attempted to address this issue by sending the defendants written notice of their transshipping violations and demanding that they cease that activity. After the defendants continued to transship PepsiCo products into Buffalo Rock's exclusive territories, Buffalo Rock commenced the present action against them in 2019.[6]

In its most recent amended complaint, filed in 2020, Buffalo Rock alleged, among others, claims of tortious interference with a business relationship and prospective business relationships, tortious interference with a contract, and conspiracy. As to its tortious-interference claims,

---

[6]Buffalo Rock also sued PepsiCo in this action but voluntarily dismissed it before the filing of this mandamus petition.

Buffalo Rock specifically alleged that the defendants intentionally interfered with two of its business relationships: (1) its contractual relationship with PepsiCo and (2) its current and prospective business relationships with C-stores in its exclusive territories. It alleged that it had "a clear, specific, legal right to its exclusive territories and for Defendants … not to transship PepsiCo products, directly or indirectly into [its] exclusive territories."[7] Buffalo Rock sought damages for lost profits and punitive damages, as well as an injunction prohibiting the defendants from continuing to engage in transshipping in its exclusive territories to prevent "loss of customers and reputation."

In their answer to Buffalo Rock's complaint, the defendants asserted a variety of affirmative defenses to the claims against them, including the justification defense, the competitor's privilege defense, and the "antitrust" or illegality defense.

Following additional filings and proceedings, the defendants filed a joint summary-judgment motion. In that motion, they argued that, because they were not parties to Buffalo Rock's EBAs with PepsiCo, those

---

[7]Buffalo Rock did not bring a trademark-infringement claim or any type of intellectual-property claim. Buffalo Rock also did not bring any claim under the Soft Drink Act.

contracts could not prohibit them from purchasing PepsiCo soft-drink products from out-of-state wholesalers and then reselling those products to their C-store clients in Alabama even if those clients happened to be located in Buffalo Rock's exclusive territories. The defendants further argued that an order enjoining them from continuing to buy PepsiCo products from out-of-state wholesalers and from selling those products to their respective C-store clients, even ones that may be located in Buffalo Rock's exclusive territories, would amount to an "illegal restraint of trade" or "illegal antitrust activity" in violation of the Sherman Antitrust Act, see 15 U.S.C. § 1-2. Following a hearing, the trial court denied the defendants' joint summary-judgment motion and set the case for a jury trial.

Shortly after the denial of the defendants' summary-judgment motion, Buffalo Rock filed three motions in limine in which it sought (1) to "exclude all evidence, testimony and arguments by Defendants at trial of a competitor's privilege or justification defense to Buffalo Rock's intentional interference claims"; (2) to "exclude all evidence, testimony and arguments by Defendants at trial of an affirmative 'antitrust' or 'illegality' defense to Buffalo Rock's intentional interference claims and

Buffalo Rock's request for permanent injunction"; and (3) to "exclude any testimony, evidence, argument, or reference at trial relating to the Transshipment Enforcement Program ('TEP') established by PepsiCo and any payments or credits to Buffalo Rock thereunder."

After the defendants filed their responses to Buffalo Rock's motions, the trial court held a lengthy hearing on those motions. It later entered three separate, brief orders granting each of those motions.[8]

Shortly thereafter, the defendants jointly petitioned this Court for a writ of mandamus in which they asked this Court to direct the trial court to vacate all three of its orders. We ordered answers and briefs.

## Standard of Review

It is well settled that "[a] trial court's disallowance of a party's affirmative defense[s] is reviewable by a petition for a writ of mandamus." Ex parte Buffalo Rock Co., 941 So. 2d 273, 277 (Ala. 2006).[9]

---

[8]In those orders, the trial court did not state its reasons as to why it was granting those motions.

[9]See also Ex parte Teal, 336 So. 3d 165, 168, 171 & n.3 (Ala. 2021) (granting petition for writ of mandamus) (citing and quoting Ex parte Buffalo Rock Co., 941 So. 3d 273, 277 (Ala. 2006)); Ex parte Gadsden Country Club, 14 So. 3d 830 (Ala. 2009); and Ex parte Tahsin Indus. Corp., U.S.A., 4 So. 3d 1121 (Ala. 2008).

This Court has stated:

> "'Mandamus is an extraordinary remedy and will be granted only where there is "(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) properly invoked jurisdiction of the court."'"

Id. (citations omitted).

### Discussion

In their mandamus petition, the defendants argue that, by granting Buffalo Rock's motions in limine and excluding all evidence, testimony, and arguments related to their affirmative defenses and the TEP, the trial court improperly deprived them of the ability to rebut the evidence that Buffalo Rock will present in support of its tortious-interference claims when this case proceeds to trial. We will address each motion in limine in turn.

### Motion In Limine to Exclude the Defendants' Justification and Competitor's Privilege Defenses

The defendants first contend that the trial court erred in granting Buffalo Rock's motion in limine requesting that they be prevented from presenting any evidence, testimony, or arguments in support of their justification and competitor's privilege defenses. In addressing this

contention, we begin with an overview of the tort of intentional interference.

It is well settled that the elements of a tortious-interference claim are: "(1) the existence of a protectable business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." White Sands Grp., L.L.C. v. PRS II, LLC, 32 So. 3d 5, 14 (Ala. 2009) ("White Sands II"). Although this Court has previously explained that "[i]t is widely recognized that tortious interference with a contractual relationship is a claim separate and distinct from interference with a business relationship or expectancy," we have nevertheless also recognized that they are related torts and should be viewed on a spectrum. White Sands Grp., LLC v. PRS II, LLC, 998 So. 2d 1042, 1054 (Ala. 2008) ("White Sands I"). Specifically, we have explained: "'The two torts are initially distinguished by their primary elements -- one tort deals with the interference with a fixed-term contract that is already in existence; the other tort deals with "mere expectancies." The latter element determines which interests along the continuum of business dealings are protected.'" Id. (quoting Orrin K. Ames III, Tortious

13

Interference with Business Relationships: The Changing Contours of this Commercial Tort, 35 Cumb. L. Rev. 317, 330 (2004-2005)) (emphasis in White Sands I). In other words, the relevant difference between these torts is the object of the interference -- i.e., the contract vs. the business relationship.

This Court, moreover, has previously held that justification is an affirmative defense to a tortious-interference claim, see White Sands II, 32 So. 3d at 12, and that the competitor's privilege defense is a "special application" of the justification defense. See id. at 18. As relevant here, we have also recognized that a defendant can assert both justification and competitor's privilege as affirmative defenses to a tortious-interference claim in the same action. See Soap Co. v. Ecolab, Inc., 646 So. 2d 1366, 1371 (Ala. 1994), overruled on other grounds by White Sands II.

A. The Justification Defense

With regard to the justification defense, in Gross v. Lowder Realty Better Homes & Gardens, 494 So. 2d 590 (Ala. 1986), this Court reviewed the law of intentional interference with contractual relations and the law of intentional interference with business relations and adopted the

following "rule":

> "[The] tort of intentional interference with business or contractual relations, to be actionable, requires:
>
> > "(1) The existence of a contract or business relation;
> >
> > "(2) Defendant's knowledge of the contract or business relation;
> >
> > "(3) Intentional interference by the defendant with the contract or business relation;
> >
> > "(4) Absence of justification for the defendant's interference; and
> >
> > "(5) Damage to the plaintiff as a result of defendant's interference."

494 So. 2d at 597 (footnotes omitted). As to the element of "[a]bsence of justification for the defendant's interference," this Court explained that whether a defendant's interference is justified is generally a question to be resolved by the trier of fact and "depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the surrounding circumstances." Id. at 597 n.3.

Adopting Restatement (Second) of Torts (Am. Law Inst. 1979) ("Restatement"), this Court in Gross noted that the following are among

15

the factors to be "consider[ed]" when determining whether a defendant's interference with a contractual or business relationship is justified:

> "'(a) the nature of the actor's conduct,
>
> "'(b) the actor's motive,
>
> "'(c) the interests of the other with which the actor's conduct interferes,
>
> "'(d) the interests sought to be advanced by the actor,
>
> "'(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
>
> "'(f) the proximity or remoteness of the actor's conduct to the interference, and
>
> "'(g) the relations between the parties.'"

Id. (quoting Restatement (Second) of Torts § 767 (Am. Law Inst. 1979)).

Years later, in White Sands II, this Court revisited Gross and its progeny because of what we perceived as years of ambiguity concerning the exact elements of a tortious-interference claim. After noting that many cases, including Gross, have deemed the "absence of justification" to be a prima facie element of a tortious-interference claim, we concluded that such a requirement was illogical. Specifically, this Court held that "the absence of justification is no part of a plaintiff's prima facie case in

16

proving wrongful interference with a business or contractual relationship" but is, instead, "an affirmative defense to be pleaded and proved by the defendant." 32 So. 3d at 12 (emphasis added). This Court overruled those cases to the extent that they held to the contrary. Id. at 14 (overruling Ex parte Awtrey Realty Co., 827 So. 2d 104 (Ala. 2001), Colonial Bank v. Patterson, 788 So. 2d 134 (Ala. 2000), Folmar & Assocs. LLP v. Holberg, 776 So. 2d 112 (Ala. 2000), Mutual Sav. Life Ins. Co. v. James River Corp. of Virginia, 716 So. 2d 1172 (Ala. 1998), Sevier Ins. Agency, Inc. v. Willis Corroon Corp. of Birmingham, 711 So. 2d 995 (Ala. 1998), Soap Co. v. Ecolab, Inc., 646 So. 2d 1366 (Ala. 1994), Underwood v. South Cent. Bell Tel. Co., 590 So. 2d 170 (Ala. 1991), Betts v. McDonald's Corp., 567 So. 2d 1252 (Ala. 1990), Valley Props., Inc. v. Stahan, 565 So. 2d 571 (Ala. 1990), and Gross v. Lowder Realty Better Homes & Gardens, 494 So. 2d 590 (Ala. 1986)).

However, we upheld the portions of those decisions applying § 767 of the Restatement and the comments thereto and again emphasized that "'[w]hether a defendant's interference is justified depends upon a balancing of the importance of the objective of the interference against the importance of the interest interfered with, taking into account the

surrounding circumstances.'" <u>White Sands II</u>, 32 So. 3d at 12 (quoting

<u>Gross</u>, 494 So. 2d at 597 n.3, quoting in turn the <u>Restatement</u> § 767)

(emphasis added). Accordingly, this Court explained:

> "'Under the same circumstances interference by some means is not improper while interference by other means is improper; and, likewise, the same means may be permissible under some circumstances while wrongful in others. <u>The issue is not simply whether the actor is justified in causing the harm, but rather whether he is justified in causing it in the manner in which he does cause it</u>.'"

<u>Id.</u> at 13 (quoting cmt. c to the <u>Restatement</u> § 767 (some emphasis added;

some emphasis in <u>White Sands II</u>).

We also reiterated that the question whether a defendant's

interference is justified is "generally a jury question." <u>Id.</u> at 18 (citing

<u>Specialty Container Mfg., Inc. v. Rusken Packaging, Inc.</u>, 572 So. 2d 403,

408 (Ala. 1990), and <u>Gross</u>, 494 So. 2d at 597 n.3). Thus, although absence

of justification is not a prima facie element of a tortious-interference

claim, justification is an affirmative defense to a tortious-interference

claim, and this Court continues (1) to apply the "justification factors" set

forth in § 767 of the <u>Restatement</u> to cases in which a justification defense

has been raised and (2) to recognize that justification as a defense to a

tortious-interference claim is ordinarily a question for the jury. <u>See, e.g.,</u>

Cobbs, Allen & Hall, Inc. v. EPIC Holdings, Inc., 335 So. 3d 1115, 1131 (Ala. 2021) ("'We retain the principle that justification is an affirmative defense to be pleaded and proved by the defendant. Whether the defendant is justified in his interference is generally a question to be resolved by the trier of fact.'" (quoting Gross, 494 So. 2d at 597 n.3)).

Buffalo Rock contends that because it had exclusive license agreements with PepsiCo, the fact-finder (in this case, the jury) cannot consider the justification defense. According to Buffalo Rock, (1) because it had the exclusive rights to bottle and to distribute PepsiCo's soft-drink products in the territories designated in its EBAs with PepsiCo and (2) because there was no dispute that the defendants knew about this contractual relationship but proceeded to sell PepsiCo soft-drink products to C-stores within Buffalo Rock's exclusive territories anyway, the trial court's exclusion of any evidence, testimony, or arguments in support of the defendants' justification defense was merited.

Buffalo Rock does not argue that the defendants failed to present evidence regarding any of the justification factors or that there was no genuine issue of material fact as to any of the justification factors; instead, it argues merely that the justification factors are simply

19

irrelevant given its exclusive contracts.

In contrast, the defendants argue that they have substantial evidence that shows that any interference was justified under the justification factors set forth in the Restatement and that the jury is entitled to consider the justification factors in light of that evidence. In fact, they spend 10 pages of their mandamus petition arguing about the application of the 7 justification factors. For instance, the defendants argue that they have secured much of the business of various C-stores in Buffalo Rock's exclusive territories because, they say, they provide better and more efficient customer service. The defendants also contend that they have evidence showing that they are selling PepsiCo soft-drink products when Buffalo Rock is unwilling or unable to fill orders. Specifically, according to the defendants, they have evidence showing that they normally sell products to C-stores in smaller quantities than Buffalo Rock sells its PepsiCo products because, they say, C-stores need smaller lot sizes. They also claim that they have evidence showing that they visit the C-stores more frequently because they market a wide variety of products beyond soft drinks and are therefore able to adjust

20

when particular soft-drink products have been sold out.[10]

The defendants also insist that they have evidence showing that Buffalo Rock has no existing business relationship with many of their C-store clients and that Buffalo Rock did not even know who some of their customers were before discovery. They further argue that there is no Alabama caselaw allowing a tortious-interference-with-a-business-relationship claim when the plaintiff has never done business with a party with whom the defendant is allegedly interfering and may not even know that party exists. See Petition at 26 (citing Glennon v. Rosenblum, 325 F. Supp. 3d 1255, 1267 (N.D. Ala. 2018) (recognizing that a business "does not have a legally protectable relationship with every potential participant in their local market"); McCreight v. AuburnBank, 611 F. Supp. 3d 1336, 1343 (M.D. Ala. 2020) (same)).

Finally, according to the defendants, they have no contractual relationship with either Buffalo Rock or PepsiCo and, as a result, are not

---

[10]Buffalo Rock strongly disputes all of those assertions, including that it has been "unable" or "unwilling" to fill orders. It also contends, as noted earlier, that the defendants do not adhere to PepsiCo's quality-control requirements by, for example, not selling PepsiCo soft-drink products within a certain number of days of their expiration dates.

bound by the terms of the EBAs between those parties -- including any provisions of those agreements that grant Buffalo Rock exclusive rights to distribute PepsiCo soft-drink products in its exclusive territories. Instead, they claim they had a lawful right to buy and sell PepsiCo soft-drink products.

In support of its contention that this justification evidence is irrelevant, Buffalo Rock relies on this Court's prior decision in <u>Alcazar Amusement Co. v. Mudd & Colley Amusement Co.</u>, 204 Ala. 509, 86 So. 209 (1920). In that case, the plaintiff, an operator of a Birmingham movie theater, had a contract with a film distributor that granted the plaintiff an exclusive right to show a new film. The defendant, an operator of a competing movie theater in Birmingham, nevertheless reached an agreement with that same film distributor to show the new film in violation of the plaintiff's exclusive contract rights. The plaintiff filed suit to enjoin the defendant from showing the movie on the basis that the plaintiff had the exclusive right to show the movie. The trial court granted the plaintiff's request for an injunction, and the defendant appealed.

On appeal, this Court addressed whether the trial court could grant

an injunction that "sought to prevent a third party … from enjoying the benefit … of a conscious aiding of a party to an existing contract to breach it," 204 Ala. at 513, 86 So. at 211, and held that the third party in that case, namely, the defendant, could be enjoined from showing a film in violation of the plaintiff's exclusive contract with the distributor. In support of that conclusion, this Court explained:

> "A third party who, with knowledge of the existence of a valid contract between others, interferes with its performance or consciously contributes to the impairment of the rights of a party thereto to avail of its obligations (especially wherefrom a selfish advantage or benefit may accrue to such third party), … commits a tort and is liable for the consummated wrong …."

204 Ala. at 513, 86 So. at 212.

Relying on Alcazar and Alabama Power Co. v. Thompson, 278 Ala. 367, 178 So. 2d 525 (1965), Buffalo Rock argues that a per se rule exists establishing liability in tortious-interference cases when the defendant "'knowingly interferes with the performance of a valid contract between others, or … contributes to the impairment of the rights of a party thereto.'" Answer at 12 (quoting Thompson, 278 Ala. at 370, 178 So. 2d at 528 (emphasis added)). According to Buffalo Rock, in such circumstances, any evidence of justification becomes irrelevant. Because

the defendants knowingly distribute PepsiCo soft-drink products inside the exclusive territories granted to Buffalo Rock under its contracts with PepsiCo, Buffalo Rock contends that, under Alcazar, they are liable for tortious interference and, thus, were appropriately prohibited by the trial court from presenting evidence in support of their justification defense.

The defendants correctly note, however, that this Court, in Louisiana Oil Corp. v. Green, 230 Ala. 470, 161 So. 479 (1935), expressly held that the language quoted above from Alcazar is dicta. See 230 Ala. at 473, 161 So. at 481 (noting that "[b]y way of argument, not essential to the conclusion, the court [in Alcazar] referred to certain foreign cases holding that an action in tort exists against one who consciously interferes with the performance of a contract. This is not authoritative on the subject, since it is only stated by way of argument, and was not controlling in determining the equity jurisdiction of that case." (emphasis added)); Gross, 494 So. 2d at 595 (recognizing that "[t]he Green court stated the broader rule announced in Alcazar, supra, was 'not authoritative'").[11]

_____

[11]Indeed, this Court's decision in Alcazar determined only whether the injunction at issue was within the scope of the trial court's equity

Moreover, our Court has significantly changed the law on tortious interference since Alcazar was decided. This court has adopted and expressly reaffirmed repeatedly the Restatement test originally set forth in Gross and modified in White Sands II. Crucially, nothing in the Restatement test endorses Buffalo Rock's contention that selling products within a plaintiff's territory gives rise to liability for tortious interference whenever the plaintiff has exclusive distribution rights pursuant to a contract with the manufacturer of the products. Buffalo Rock never attempts to grapple with the Restatement test. We also said nothing in Gross or its progeny to indicate that we were adopting the

---

powers. However, even if the language in Alcazar were authoritative, it does not stand for the proposition that the defendants' sale of PepsiCo soft-drink products to C-stores within Buffalo Rock's exclusive territories gives rise to liability for tortious interference. In Alcazar, this Court upheld an injunction that "sought to prevent a third party … from enjoying the benefit … of a conscious aiding of a party to an existing contract to breach it." 204 Ala. at 513, 86 So. at 211. In other words, the language in Alcazar pertained to circumstances in which the defendant knowingly caused the film distributor to breach the terms of the distributor's own exclusive contract with the plaintiff by allowing the defendant to show the film. Here, in contrast, Buffalo Rock does not allege that PepsiCo has breached its contracts with Buffalo Rock, much less argue that the defendants have caused PepsiCo to breach its contracts by allowing the defendants to distribute PepsiCo soft-drink products in Buffalo Rock's exclusive territories.

25

dicta from <u>Alcazar</u>.

In further support of its contention, Buffalo Rock cites several decisions from other jurisdictions regarding similar EBAs and argues that the defendants have not cited a single case holding that selling "gray market" goods is bona fide competition. However, none of the decisions cited by Buffalo Rock involved preventing a defendant from presenting a defense and are thus clearly distinguishable.[12]

---

[12]For instance, Buffalo Rock cites <u>Wyoming Beverages, Inc. v. Core-Mark International, Inc.</u>, Case No. 17-CV-116-F, Jan. 4, 2018 (D. Wy. 2018) (not reported in Federal Supplement), in which several bottling companies sued a wholesaler based upon legal theories similar to the ones in this case. The United States District Court of Wyoming dismissed a claim asserting that the Soft Drink Act created a private cause of action and a portion of a tortious-interference claim but otherwise denied the motion to dismiss. Refusing to dismiss a plaintiff's claim is a far cry from granting a motion in limine preventing the presentation of evidence, testimony, and arguments in support of an affirmative defense.

Buffalo Rock then cites <u>Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.</u>, 836 F.2d 173, 177 (3d Cir. 1988), in which the State of Pennsylvania brought an action against PepsiCo for violations of antitrust laws after PepsiCo took actions against a bottler to prevent transshipping. The <u>Zimmerman</u> court found that the Soft Drink Act permitted PepsiCo to enforce its EBAs with bottlers by taking actions against bottlers who were involved in transshipping in violation of the EBAs; however, it was not asked to address whether wholesalers who transshipped were interfering in a contract and certainly did not grant a motion in limine preventing the presentation of evidence, testimony, and arguments in support of an affirmative defense.

In sum, we need not decide if the defendants are correct that their actions were justified. We need only decide whether the jury is entitled to hear their evidence of justification and consider the justification factors. Because our caselaw in Gross, White Sands II, and Cobbs, supra, is clear, we hold that the jury is entitled to hear this evidence and to determine whether the defendants should not be held liable based on a balancing of the justification factors set forth in § 767 of the

---

Buffalo Rock also cites Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., 330 N.C. 666, 412 S.E.2d 636 (1992). There, a wholesaler sued a bottling company for sharply curtailing its supply because the bottling company determined that the wholesaler was transshipping. The Supreme Court of North Carolina held that the bottling company could take such action (that is, curtailing supply) pursuant to certain provisions of the Soft Drink Act but did not even consider a tortious-interference claim on behalf of the defendant bottling company.

Finally, Buffalo Rock cites Brown Bottling Group, Inc. v. Imperial Trading Co., Civil Action No. 3:19-CV-142-HTW-LGI, Mar. 4, 2022 (S.D. Miss. 2022) (not reported in Federal Supplement), in which a bottling company brought similar tortious-interference claims against a wholesaler, and Bama ICEE LLC v. J & J Snack Foods Corp., Case No. 7:18-cv-01327-LSC, May 8, 2019 (N.D. Ala. 2019) (not reported in Federal Supplement), in which Bama ICEE LLC brought similar tortious-interference claims against a wholesaler. Both of those cases are distinguishable, however, because the trial court in those cases merely denied motions to dismiss.

Restatement.[13] Accordingly, the trial court's decision to exclude any evidence, testimony, or arguments related to the defendants' justification defense was improper, and the petition is due to be granted on this ground.

### B. The Competitor's Privilege Defense

In addition, the trial court granted Buffalo Rock's motion in limine seeking to exclude any evidence, testimony, or arguments related to the defendants' competitor's privilege affirmative defense. As stated previously, this defense is a "special application" of the justification defense and can be asserted in conjunction with a justification affirmative defense. See White Sands II, 32 So. 3d at 18.

The competitor's privilege defense originated in § 768 of the Restatement and was first adopted by this Court in Soap Co. v. Ecolab, Inc., 646 So. 2d 1366, 1370 (Ala. 1994), overruled on other grounds by White Sands II, supra. It applies "'when the contract involved is terminable at will or when the defendant causes a third person not to

---

[13]Moreover, it would seem that evidence relating to the justification factors would also be relevant to Buffalo Rock's claim for punitive damages.

enter into a prospective contract with another who is his competitor.'"

Tom's Foods, Inc. v. Carn, 896 So. 2d 443, 457 (Ala. 2004) (quoting Soap

Co., 646 So. 2d at 1369).

Under that defense:

"'(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue in an existing contract terminable at will does not interfere improperly with the other's relation if

"'(a) the relation concerns a matter involved in the competition between the actor and the other and

"'(b) the actor does not employ wrongful means and

"'(c) his action does not create or continue an unlawful restraint of trade and

"'(d) his purpose is at least in part to advance his interest in competing with the other.

"'(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.'"

Tom's Foods, 896 So. 2d at 457-58 (quoting the Restatement § 768

(emphasis added). Comment b to § 768 states in relevant part:

"The rule stated in this Section is a special application of the

29

factors determining whether an interference is improper or not, as stated in § 767. <u>One's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors</u>. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor. And he may seek to do so directly by express inducement as well as indirectly by attractive offers of his own goods or services."

(Emphasis added.) Comment e to § 768, in relevant part, discusses the "wrongful means" element of the competitor's privilege:

"If the actor employs wrongful means, he is not justified under the rule stated in this Section. The predatory means discussed in § 767, Comment c, <u>physical violence, fraud, civil suits and criminal prosecutions, are all wrongful</u> in the situation covered by this Section. On the other hand, the actor <u>may use persuasion and he may exert limited economic pressure</u>. …

"The rule stated in this Section rests on the belief that <u>competition is a necessary or desirable incident of free enterprise</u>. Superiority of power in the matters relating to competition is believed to flow from superiority in efficiency and service. If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purpose for which competition is encouraged."

(Emphasis added.) This Court has quoted with approval the following interpretation of the "wrongful means" required to establish either tortious interference with existing at-will contracts or tortious

30

interference with prospective contracts:

> """Competitors and their allies are not necessarily gentlemen -- or even scholars. Competition may be rough and tumble and even -- within reasonable bounds -- involve economic factors extraneous to the main competition itself. We do not believe a searching analysis only of motive is in most instances enough to send these cases to the jury. There must still ... be something 'illegal' about the means employed."""

Tom's Foods, 896 So. 2d at 458 (quoting Soap Co., 646 So. 2d at 1370, quoting in turn, with approval, Great Escape, Inc. v. Union City Body Co., 791 F.2d 532, 543 (7th Cir. 1986)).

"""[C]ompetition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference in another's business relations, and is not actionable, so long as it is carried on in furtherance of one's own interests.""" Soap Co., 646 So. 2d at 1371 (quoting Bridgeway Commc'ns, Inc. v. Trio Broad., Inc., 562 So. 2d 222, 223 (Ala. 1990), quoting in turn Beasley-Bennett Elec. Co. v. Gulf Coast Chapter of the Nat'l Elec. Contractors Ass'n, 273 Ala. 32, 35, 134 So. 2d 427, 428 (1961)). As relevant here, this Court has previously recognized that the applicability of the competitor's privilege affirmative defense is also a question for the trier of fact. White Sands II, 32 So. 3d at 18.

31

Buffalo Rock makes the same argument in support of the exclusion of the competitor's privilege defense as it did in support of the exclusion of the justification defense -- that because its EBA with PepsiCo is an exclusive contract, "there is no privilege to compete." Answer at 16. It argues that the justification and competitor's privilege defenses are "inseparable in this case" and "rise and fall together" and "require the same quantum of proof." Id. at 17, 18. Thus, it explains that the competitor's privilege defense is simply irrelevant and cannot apply in this case. Further explaining this argument, Buffalo Rock claims that in order for a party to establish the applicability of the competitor's privilege defense, that party must show that it did not employ "'wrongful means.'" Id. at 17 (quoting White Sands II, 32 So. 3d at 18). That determination, Buffalo Rock says, "'directly involves at least six of [the] seven [justification] factors,'" thereby rendering the justification and competitor's privilege defenses inseparable. Id.

At least in this case, Buffalo Rock is correct that those defenses "rise and fall together." Its competitor's privilege argument fails for the same reasons that its justification argument fails. As explained above, whether the justification defense applies involves a balancing test based upon

32

multiple justification factors listed in § 767 of the <u>Restatement</u>. The "interests of the other with which the actor's conduct interferes" is only one factor in the <u>Restatement</u> justification test. Buffalo Rock also makes no attempt to argue that the evidence does (or does not) satisfy either of the relevant tests set forth in § 767 and § 768 of the <u>Restatement</u>. Buffalo Rock does mention the "wrongful means" element of the competitor's privilege defense discussed in § 768 of the <u>Restatement</u>, but it does so in only one sentence and does not cite any supporting law applying this element.[14] In fact, the comments to § 768 refer to "wrongful means" as (among other similar things): "physical violence, fraud, civil suits and criminal prosecutions," and there is no evidence of any of those "wrongful means" in the materials before us.

Buffalo Rock also contends that the competitor's privilege defense does not apply in this case because, it says, "under Alabama law, there is

---

[14]We note briefly that Buffalo Rock does cite, in a string citation, the <u>Restatement (Third) of Torts: Liability for Economic Harm</u> § 17 (2020), and contends that this <u>Restatement</u> states that "conduct is 'wrongful' where 'defendant acted for the purpose of appropriating the benefits of the plaintiff's contract.'" Answer at 12 n.6. Our Court has never adopted or even cited this <u>Restatement</u>, much less any section within § 17 of this <u>Restatement</u>. Buffalo Rock does not ask us to adopt it today and does not attempt to explain how it is consistent with our existing caselaw. We therefore see no reason to address it further here.

no competitor's privilege to interfere with a contract that is <u>not terminable at will</u>," which, Buffalo Rock notes, is "[a] contract of indefinite duration containing defined events of termination …." Answer at 16 (citing <u>White Sands II</u>, 32 So. 3d at 18; <u>Soap Co.</u>, 646 So. 2d at 1369; <u>Southern Housing P'ships, Inc. v. Stowers Mgmt. Co.</u>, 494 So. 2d 44, 46, 48 (Ala. 1986); and <u>Phenix City v. Alabama Power Co.</u>, 239 Ala. 547, 195 So. 894 (1940)) (emphasis added). Because its EBAs with PepsiCo are "indefinite contracts containing defined events of termination," Buffalo Rock contends that they are not "terminable at will" and, thus, that the competitor's privilege defense cannot apply in this case.

In making this argument, Buffalo Rock fails to recognize that it has made two tortious-interference claims, including a claim of tortious interference with its business relationships (or prospective business relationships) with the defendants' C-store clients. As explained previously, the competitor's privilege defense can apply "'when the contract involved is terminable at will <u>or when the defendant causes a third person not to enter into a prospective contract with another who is his competitor</u>.'" <u>Tom's Foods</u>, 896 So. 2d at 457 (quoting <u>Soap Co.</u>, 646 So. 2d at 1369) (emphasis added). The arguments and materials

34

submitted to this Court do not indicate that Buffalo Rock had contracts with any of the defendants' C-store clients -- much less any contracts which were indefinite or not terminable at will. The defendants also correctly note that they have not caused PepsiCo to either breach or abandon its contracts with Buffalo Rock and note that the EBAs are still in place.[15] Under these circumstances, the competitor's privilege defense remains applicable here. The defendants should be permitted to present evidence in support of that defense because, as noted above, whether the competitor's privilege defense applies in a particular case is a question for the trier of fact -- in this case, the jury. Accordingly, we hold that the defendants can present testimony, evidence, and arguments in support of their competitor's privilege affirmative defense.

<u>Motion in Limine Regarding</u>
<u>PepsiCo's Transshipment Enforcement Program</u>

---

[15]Buffalo Rock, apparently responding to this argument, claims that "Alabama law aligns with the <u>Restatement (Second) of Torts</u> § 766A (1979), that a party who makes performance more difficult or burdensome commits a tort." Answer at 12 n.6. In other words, Buffalo Rock argues that it can bring a tortious-interference claim even if its contracts with PepsiCo remain in place. Our Court has not expressly adopted this section of the <u>Restatement</u>; however, given our discussion above, we need not (and do not) reach the questions whether we should adopt it (or some variation on it) and whether it should apply to this case.

35

Next, the defendants contend that the trial court erred in granting Buffalo Rock's motion in limine seeking to bar evidence, testimony, or arguments related to PepsiCo's TEP when, they say, Buffalo Rock has repeatedly made clear throughout this litigation that the TEP was an integral part of its business relationship with PepsiCo with which they have allegedly interfered. Therefore, the defendants argue that the TEP is directly relevant to the seventh justification factor -- "relations between the parties." They further argue that the fact that the TEP was established to mitigate any lost profits that PepsiCo's exclusive bottlers and distributors, including Buffalo Rock, may incur means that any credits or payments received through that program must be presented to and considered by the jury as part of its calculation of any damages it may choose to award Buffalo Rock should it enter a judgment in its favor.

In response, Buffalo Rock argues that Alabama's collateral-source rule bars any evidence of payments or credits it may have received through the TEP. Buffalo Rock further argues that, even if the collateral-source rule did not apply, given the considerable amount of transshipment activity that it believes has been occurring in its exclusive territories over the last 10 years, it would be very difficult to verify if any

36

payments or credits that it has received from the TEP during that period were the result of the defendants' transshipping activities in its exclusive territories.

As an initial matter, we note that Alabama courts have historically applied the collateral-source rule to personal injury cases. See, e.g., McCormick v. Bunting, 99 So. 3d 1248, 1250 n.3 (Ala. Civ. App. 2012) (explaining that the "common-law collateral-source rule prevented reduction of the amount of damages recoverable in a personal-injury action based on a plaintiff's receipt of benefits 'from a source wholly collateral to and independent of the wrongdoer' and rendered any evidence of the receipt of such benefits irrelevant and inadmissible." (quoting Williston v. Ard, 611 So. 2d 274, 278 (Ala. 1992))). See also Washington v. United States, 17 F. Supp. 3d 1154, 1157 (S.D. Ala. 2014) ("In its classic formulation, Alabama's collateral source rule meant that a defendant in a personal injury case could not obtain a reduction in a plaintiff's damages award based on that plaintiff's receipt of medical benefits from a collateral source." (emphasis added)). Despite insisting that this legal principle prevents the introduction of any evidence concerning the TEP in this case, Buffalo Rock does not cite a single case

applying the collateral-source rule in cases involving a claim of tortious interference with business relations.

Even if the collateral-source rule could apply to a tortious-interference claim, for the reasons explained below, the defendants should be allowed to present evidence concerning the TEP and any payments or credits that Buffalo Rock may have received as a result of that program.

First, we agree with the defendants that evidence regarding the TEP is relevant to the seventh justification factor concerning the "relations between the parties." Buffalo Rock cannot sue the defendants for allegedly interfering with its business relationship with PepsiCo under the EBAs while simultaneously seeking to exclude any evidence of the other key component of its business relationship with PepsiCo that appears to provide a remedy for that purported interference -- the TEP. This alone is a sufficient basis on which to grant the petition as to this motion in limine.

Second, the TEP is also relevant to the calculation of damages in this case. The materials before us appear to indicate that Buffalo Rock alleged in its most recent amended complaint that it was entitled to

damages for lost profits and punitive damages. Under Alabama law, "jury verdicts awarding lost profits will be affirmed if the plaintiff provides a 'basis upon which the jury could, with <u>reasonable</u> certainty, calculate the amount of profits which were lost as a result of' defendant's wrongful actions." <u>Super Valu Stores, Inc. v. Peterson</u>, 506 So. 2d 317, 327 (Ala. 1987) (quoting <u>Morgan v. South Cent. Bell Tel. Co.</u>, 466 So. 2d 107, 116 (Ala. 1985)). Lost-profit damages are generally calculated by determining "the difference between the price agreed upon in the contract and the cost of performance or, in other words, the profit." <u>Cobbs v. Fred Burgos Constr. Co.</u>, 477 So. 2d 335, 338 (Ala. 1985).

Buffalo Rock does not dispute that, in seeking damages, it intends to offer at trial a calculation of lost profits through the testimony of its damages expert, Dr. Hank Fishkind. According to the materials before us, during his deposition, Dr. Fishkind appeared to concede that the TEP credits Buffalo Rock received from PepsiCo compensated Buffalo Rock for transshipped products and that those credits should be used, at least in part, to offset the amount of lost-profit damages that Buffalo Rock is seeking in this action. Likewise, the defendants' experts, Robert G. Hammond, Ph.D., and Jason B. Wells, a certified public accountant,

agree with Dr. Fishkind that calculating Buffalo Rock's claimed lost profits requires subtracting the TEP credits.

Although Buffalo Rock strongly disputes that its expert has made a concession, the materials before us also indicate that the TEP credits reduce the "cost of performance" of Buffalo Rock. In fact, the evidence submitted by the parties indicates that the TEP payments from PepsiCo to Buffalo Rock exceeded $3 million from 2016-2019. Because those payments are actually part of the relationship/contract that Buffalo Rock had with PepsiCo, they are relevant both to the justification factors and to damages in this case. We acknowledge the argument by Buffalo Rock that the TEP payments may only cover a fraction of its alleged losses; however, that argument raises a question of the extent of its damages and is for the jury to decide.

Moreover, the materials before us also indicate that, between December 2020 and April 2021, Buffalo Rock failed to submit TEP claims to PepsiCo. It has offered this Court no explanation for why it failed to do so other than to allege that the TEP is "inefficient" and "fails to identify all transshipped product[s]." Answer at 24.

Under Alabama law, a plaintiff has a duty to mitigate its damages. See, e.g., CSX Transp., Inc. v. Miller, 46 So. 3d 434, 454 (Ala. 2010) (recognizing that "[t]he duty to mitigate damages arises after a party has suffered injury, loss, or damage"); Avco Fin. Servs., Inc. v. Ramsey, 631 So. 2d 940, 942 (Ala. 1994) (same); Equilease Corp. v. McKinney, 52 Ala. App. 109, 113-14, 289 So. 2d 809, 812 (Civ. 1974) (recognizing that "[t]he law in Alabama is clear that the injured party has a duty to minimize his damages and may not recover for damages which might have been avoided"). Moreover, this Court has also stated that "'the injured party is not to be put in a better position by a recovery of damages for the breach than he would have been in if there had been performance.'" Burch v. Lake Forest Prop. Owners' Ass'n, Inc., 565 So. 2d 611, 612 (Ala. 1990) (quoting Curacave, Inc. v. Pollack, 501 So. 2d 470, 472 (Ala. Civ. App. 1986), citing in turn 25 C.J.S. Damages § 74 (1955)) (emphasis added).

Buffalo Rock does not dispute that it had a duty to mitigate its damages. The evidence presented thus far indicates that the TEP, even if it is inefficient, provides Buffalo Rock an avenue for doing so. Furthermore, the defendants are entitled to present evidence related to Buffalo Rock's decision not to mitigate its damages through the TEP to

argue for a reduction the amount of any damages that the jury may choose to award to Buffalo Rock should it prevail below.

For all the foregoing reasons, we hold that the defendants are entitled to present evidence, testimony, and arguments concerning the TEP, including evidence of any payments or credits received by Buffalo Rock as a result of that program.

<u>Motion In Limine Concerning the Defendants'<br>"Antitrust" or "Illegality" Defense</u>

Finally, with regard to the trial court's decision to grant Buffalo Rock's motion in limine excluding evidence, testimony, or arguments related to the defendants' "antitrust" or "illegality" defense, the defendants argue that their ability to assert that defense is critical because, they say, Buffalo Rock is attempting to use federal law -- here, the Soft Drink Act -- to create a monopoly in the soft-drink industry by illegally going after third-party distributors like them and using its EBAs with PepsiCo as a "sword" against them. According to the defendants, Buffalo Rock is attempting to do so primarily by seeking an injunction prohibiting them from selling PepsiCo's soft-drink products in Buffalo Rock's exclusive territories.

Buffalo Rock contends, however, that seeking an injunction to

prevent the defendants from selling PepsiCo soft-drink products in its exclusive territories and to protect its contractual rights and its legitimate business relationships and business expectancies from interference by third parties is not unlawful. According to Buffalo Rock, the Soft Drink Act expressly permits its exclusive-territory licenses with PepsiCo and would preempt any Alabama state law to the contrary. Therefore, it contends that its contracts with PepsiCo and the relief it is seeking in the present case are not an "antitrust" violations and are not otherwise "illegal" and that the trial court properly struck that affirmative defense.

Section 3501 of the Soft Drink Act states, in relevant part:

"Nothing contained in any antitrust law shall render unlawful the inclusion and enforcement in any trademark licensing contract …, pursuant to which the licensee engages in the … sale of a trademarked soft drink product, of provisions granting the licensee the … exclusive right to … sell such product in a defined geographic area or limiting the licensee, directly or indirectly to the … sale of such product only for … resale to consumers … within a defined geographic area …."

15 U.S.C. § 3501 (emphasis added). Buffalo Rock contends that the intent behind this section of the Soft Drink Act was to "'exempt from the antitrust laws agreements which essentially forbid transshipping of soft

43

drinks by resellers.'" Answer at 22-23 (quoting O'Neill v. Coca-Cola Co., 669 F. Supp. 217, 225 (N.D. Ill. 1987)). According to Buffalo Rock, the EBAs in this case merely restrict "intrabrand" competition and therefore actually "'foster interbrand competition.'" Answer at 6, 22 (quoting Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 176 (3d Cir. 1988)) (emphasis added).

The defendants contend, however, that a different portion of the Soft Drink Act -- 15 U.S.C. § 3502 -- makes clear that the Soft Drink Act does not legalize "horizontal" restraints of trade. That section of the Soft Drink Act states, in relevant part:

> "Nothing in this chapter shall be construed to legalize the enforcement of provisions described in [§] 3501 of this title in trademark licensing contracts … by means of price fixing agreements, horizontal restraints of trade, or group boycotts, if such agreements, restraints or boycotts would otherwise be unlawful."

(Emphasis added.) According to the defendants, Buffalo Rock's proposed injunction seeking to foreclose them from selling PepsiCo's soft-drink products to their C-store clients in its exclusive territories would violate both federal and Alabama antitrust law because such action would constitute a "horizontal restraint[] of trade." The defendants further argue that the Soft Drink Act, at most, merely creates a shield against

44

enforcement of antitrust laws when vertical license agreements between a manufacturer and a bottler have certain terms like the EBAs in this case; it does not provide a sword for bottlers like Buffalo Rock to use against third parties who are not part of those agreements. The defendants contend that, had Congress wanted to do so, it could have provided for a cause of action against third parties in the Soft Drink Act, which it chose not to do.

At oral argument before this Court, the defendants conceded that their antitrust/illegality affirmative defense was relevant only to the request for injunctive relief. An injunction is an equitable remedy. This Court has previously recognized that when legal and equitable claims are presented in one action, the trial court must resolve the equitable claims in a way that does not impinge on a party's right to a jury trial as to the legal claims. See Ex parte Taylor, 828 So. 2d 883 (Ala. 2001), and Ex parte Thorn, 788 So. 2d 140 (Ala. 2000). Purely legal claims, as well as factual issues common to the legal and equitable claims, must be determined by a jury; the remaining issues are then to be decided by the trial court. See Ex parte Taylor, 828 So. 2d at 883, and Ex parte Thorn, 788 So. 2d at 140. Specifically, this Court has explained:

45

"'[W]hen both legal and equitable claims are joined in one action, then, the trial judge must arrange the order of trial so that the judge's decision on the equitable issues does not operate to deny a trial by the jury of the legal issues. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 510-11, 79 S. Ct. 948, 3 L. Ed. 2d 988 (1959) (stating that "only under the most imperative circumstances, ... can the right to a jury trial of legal issues be lost through prior determination of equitable claims"); accord Crommelin v. Fain, 403 So. 2d 177, 185 (Ala. 1981). A jury first must decide any factual issues that are purely legal in nature, along with any factual issues common to the legal and equitable claims. See Dairy Queen, Inc. v. Wood, 369 U.S. 469, 479, 82 S. Ct. 894, 8 L. Ed. 2d 44 (1962) (holding that because the factual issues relating to the petitioner's breach of contract claim "[were] common with those upon which [the] respondents' claim to equitable relief [was] based, the legal claims involved in the action [had to] be determined prior to any final court determination of respondents' equitable claims"); see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2302.1, at 29 (2d ed. 1995); 1 Champ Lyons, Jr., Alabama Rules of Civil Procedure Annotated § 2.2 at 24 (3d ed. 1996) ("[Beacon Theatres] held that the questions of fact common to the legal and equitable [claims] must be decided first by the jury, for to permit the court to make findings on these common issues of fact would deprive the litigant of his right to [a] jury trial."). Once those factual findings are made, the trial judge must determine the remaining equitable issues. See Dairy Queen, 369 U.S. at 470, 82 S.Ct. 894.

"'... In addition, those factual questions that

46

> are purely legal in nature, as well as those common to the legal and equitable issues, must first be decided by the jury. <u>Dairy Queen, Inc.</u>, supra.'"

<u>Wootten v. Ivey</u>, 877 So. 2d 585, 589 (Ala. 2003) (quoting <u>Ex parte Thorn</u>, 788 So. 2d at 144-45) (emphasis in <u>Wootten</u>).

All the parties agreed at oral argument that the injunction issue will be decided by the trial court <u>after</u> the jury trial. The antitrust issues are complicated and, as Buffalo Rock points out, have a great potential to mislead and confuse the jury, unduly prejudice it, and waste the time and resources of all the trial participants. The trial court was within its discretion to exclude evidence, testimony, and arguments regarding such a defense during the jury-trial portion of this action. To the extent that any such evidence, testimony or argument is relevant to the justification factors, it would be admissible on that <u>limited basis</u>. As to any proceedings before the trial court on whether an injunction should issue, we do not decide at this time what evidence would be admissible and relevant, and we leave that decision to the sound discretion of the trial court at the appropriate time. It is for these reasons that we presently see no reason to grant mandamus relief to the defendants on this issue.

## Conclusion

47

Based on the foregoing, we grant the defendants' petition for a writ of mandamus in part and direct the trial court to vacate its orders excluding any evidence, testimony, and arguments related to the defendants' justification and competitor's privilege affirmative defenses, as well as the TEP. However, we deny the petition in part as to the trial court's decision to exclude any evidence, testimony, or arguments related to their antitrust/illegality affirmative defense.

PETITION GRANTED IN PART AND DENIED IN PART; WRIT ISSUED.

Shaw, Bryan, and Mitchell, JJ., concur.

Mendheim, J., concurs in part, concurs in the result in part, and dissents in part, with opinion.

Parker, C.J., and Stewart, J., concur in part and dissent in part, with opinions.

Sellers, J., concurs in part and dissents in part, with opinion, which Wise, J., joins.

MENDHEIM, Justice (concurring in part, concurring in the result in part, and dissenting in part).

I concur with the portion of the main opinion entitled "Motion In Limine to Exclude the Defendants' Justification and Competitor's Privilege Defenses"; I concur in the result with the portion of the main opinion entitled "Motion In Limine Regarding PepsiCo's Transshipment Enforcement Program"; and I dissent from the portion of the main opinion entitled "Motion In Limine Concerning the Defendants' 'Antitrust' or 'Illegality' Defense."

PARKER, Chief Justice (concurring in part and dissenting in part).

I concur with the Court's decision to issue a writ of mandamus directing the trial court to allow the consideration of evidence related to the "Transshipment Enforcement Program." I also concur with the Court's decision to deny the petition for a writ of mandamus directing the trial court to allow the consideration of evidence related to the petitioners' antitrust defense.

I respectfully dissent from the Court's decision to issue a writ of mandamus directing the trial court to allow the consideration of evidence relating to the petitioners' defenses of justification and competitor's privilege. I do not think that the petitioners have established a "clear legal right" to the consideration of these defenses by the trial court, nor have they demonstrated that they "lack … another adequate remedy." Therefore, they have not met the requirements of this Court's test for mandamus relief. See, e.g. Ex parte Gulf Health Hosps., Inc., 321 So. 3d 629, 632 (Ala. 2020).

In my view, the main opinion fails to distinguish adequately between interbrand and intrabrand competition. The justification and competitor's privilege defenses clearly apply to interbrand competition

(for instance, if the petitioners were selling Coke products). However, Alabama law does not clarify whether a justification or competitor's privilege defense applies to intrabrand competition within an exclusively licensed territory. If the petitioners had no legal right to compete with Buffalo Rock Company, Inc., within its exclusive territory, they have no valid justification or competitor's privilege defense, and the circuit court was right to disallow evidence relating to those defenses. As this is essentially a question of first impression for Alabama, I find the authorities cited by Buffalo Rock persuasive to establish the proposition that, as a matter of law, there is no justification for intrabrand competition within an exclusively licensed territory. See, e.g., Mannion v. Stallings & Co., 204 Ill. App. 3d 179, 188, 561 N.E.2d 1134, 1139, 149 Ill. Dec. 438, 443 (1990) (cited approvingly by this Court in Soap Co. v. Ecolab, Inc., 646 So. 2d 1366, 1370 (Ala. 1994)); Bonelli v. Volkswagen of Am., Inc., 166 Mich. App. 483, 498-99, 421 N.W.2d 213, 221 (1988); Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 802-05, 101 N.Y.S. 2d 483, 497-500 (1950); Ride the Ducks of Phila., LLC v. Duck Boat Tours, Inc., 138 F. App'x 431, 433-34 (3d Cir. 2005).

The petitioners have also failed to show that they lack an adequate remedy besides mandamus relief. They may have recourse to a motion to alter, amend, or vacate under Rule 59(e), Ala. R. Civ. P., within 30 days after the entry of the circuit court's final judgment, or, failing that, they may appeal after trial. State v. Zimlich, 796 So. 2d 399, 403 (Ala. 2000) (citing Ex parte Fowler, 574 So. 2d 745, 747 (Ala. 1990)). Thus, the petitioners have failed to satisfy two parts of this Court's four-part mandamus test.

For these reasons, I respectfully dissent to the Court's providing mandamus relief regarding evidence supporting the defenses of justification and competitor's privilege.

SELLERS, Justice (concurring in part and dissenting in part).

I agree with the Court's decision to issue a writ of mandamus directing the trial court to allow evidence and argument regarding the "Transshipment Enforcement Program" and the Court's decision to deny the petition for a writ of mandamus directing the trial court to allow evidence and argument supporting an assertion that the business relationship between Buffalo Rock Company, Inc., and PepsiCo, Inc., violates antitrust law. I respectfully dissent, however, from the Court's decision to issue a writ of mandamus directing the trial court to allow evidence and argument in support of a justification/competitor's privilege defense.

Businesses in Alabama are free to contract with others to obtain mutual advantages for their respective economic well being. While restraints and limitations on free trading and association are discouraged, we balance the conflicting concepts by allowing businesses in competitive markets to limit who will sell and distribute their products. We do this to allow companies to develop standards to obtain uniform market integrity, which creates a valuable franchise for the mutual benefit of both parties. An exclusive license "guarantee[s] the

53

economic advantage of operating without fear of competing businesses diluting the market." Bassett Seamless Guttering, Inc. v. GutterGuard, LLC, 501 F. Supp. 2d 738, 743 (M.D.N.C. 2007). The availability of the sort of arrangement existing between PepsiCo and Buffalo Rock encourages bottlers like Buffalo Rock to invest in and to promote products that otherwise might not reach consumers in sufficient quantities, fosters increased consumer choices, and helps maintain the quality of soft drinks. See Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 176 (3d Cir. 1988) ("Such restraints encourage each bottler to invest and promote in his own territory, and prevent 'free riding' by sellers from outside the territory on the bottler's investment and effort."). This type of "vertical market allocation" has been blessed by Congress via the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501 et seq. ("the Act"). See Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., 330 N.C. 666, 673, 412 S.E.2d 636, 640 (1992) (indicating that the purpose of the Act was "to preserve territorial exclusivity" in the soft-drink industry). As Buffalo Rock points out, "transshippers" like the defendants in the present case opposed passage of the Act, but they lost that political battle. Zimmerman, 836 F.2d at

177 ("A number of transshippers testified against the Act, but the record shows that Congress unequivocally rejected their position."). That the Act allows the suppression of "competition" that would otherwise take place between businesses in the position of Buffalo Rock and the defendants in this case is precisely what the Act intended. But the clear rationale behind the Act was to foster competition between the makers of different brands of soft drinks by legally creating restricted territories that granted exclusive rights to sell the products of one brand in a very competitive market among other brands. Thus, justification or a competitor's privilege defense under state law should not be available, because those defenses would undermine the very purpose of the Act. Id. at 176 ("In passing the Act, Congress determined that the exclusive territorial distribution agreements common to the soft drink industry warranted protection because that industry was a prototype of industries in which territorial restraints foster interbrand competition."). It is undisputed that Buffalo Rock contractually has an exclusive territory to market and distribute Pepsi products. Likewise, there is no dispute that the defendants sell Pepsi products in Buffalo Rock's territory. To assert a defense that the defendants are justified or have a privilege to compete

is wholly contradicted by the Act. The exclusivity here is a legal limitation on competition, which benefits rather than harms consumers. And while the parties may be competitors, the competition for a competitive advantage to sell an exclusive product in a territory subject to legal restrictions constitutes an illegal interference that cannot be justified or defended. To prohibit such a defense is not an abuse of discretion by the trial court, but is a means of case management to prevent needless consideration of issues that ultimately could be confusing to a jury and are unfounded because of the nature of the case. The trial court acted properly to exclude evidence, testimony, and argument of justification and competitive privilege. Accordingly, I respectfully dissent from the Court's decision to grant a writ of mandamus allowing the defendants to assert a justification/competitor's privilege defense.

Wise, J., concurs.

STEWART, Justice (concurring in part and dissenting in part).

I concur with the main opinion except for the portion entitled "Motion in Limine Concerning the Defendants' 'Antitrust' or 'Illegality' Defense," as to which I dissent.